IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BEATRIZ JIMENEZ; | : | |
| ROSALBA LOPEZ PEREZ; | : | CIVIL ACTION |
| GILBERTO MARTINEZ GARCIA; | : | |
| HOMERO MARTINEZ GARCIA; | : | NO. _____ |
| MIGUEL MARTINEZ GARCIA; | : | |
| DORA MARTINEZ LOPEZ; | : | |
| MIGUEL MARTINEZ LOPEZ; | : | |
| OMAR MARTINEZ LOPEZ; | : | |
| JOSE MARTINEZ VELASCO; | : | |
| JOSE MORALES LOPEZ; | : | |
| ALFONSO OROZCO LOPEZ; | : | |
| JOSE FRANCISCO RAMIREZ PEREZ; | : | |
| EVANDRO VELASCO LOPEZ; | : | |
| GLORIA VELASCO LOPEZ; and | : | |
| IVAN VELASCO LOPEZ, on behalf of themselves and others similarly situated, | | |

Plaintiffs,

v.

ROSENBAUM-CUNNINGHAM, INC.; RICHARD S. ROSENBAUM; EDWARD SCOTT CUNNINGHAM; CHRISTINA A. FLOCKEN; and DAVE & BUSTERS, INC.,

Defendants.

## COLLECTIVE ACTION COMPLAINT

Plaintiffs Beatriz Jimenez, Rosalba Lopez Perez, Gilberto Martinez Garcia,

Homero Martinez Garcia, Miguel Martinez Garcia, Dora Martinez Lopez, Miguel

Martinez Lopez, Omar Martinez Lopez, Jose Martinez Velasco, Jose Morales Lopez,

Alfonso Orozco Lopez, Jose Francisco Ramirez Perez, Evandro Velasco Lopez, Gloria

Velasco Lopez, Ivan Velasco Lopez bring this lawsuit against Defendants Rosenbaum-

Cunningham, Inc., Richard S. Rosenbaum, Edward Scott Cunningham, Christina A.

Flocken, and Dave & Busters, Inc. to recover for Defendants' violations of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, the Pennsylvania Minimum Wage Act of 1968 ("PMWA"), 43 P.S. §§ 333.101, *et seq.*, and the Pennsylvania Wage Payment and Collection Law ("PWPCL"), 43 P.S. §§ 260.1, *et seq.* Plaintiffs assert their FLSA claim on behalf of themselves and similarly situated workers throughout the United States as a collective action pursuant to 29 U.S.C. § 216(b). The following allegations are based on personal knowledge as to Plaintiffs' own acts and are made on information and belief as to the acts of others.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over Plaintiffs' FLSA claim pursuant to 28 U.S.C. § 1331.

2.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

3.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

4.     Plaintiff Beatriz Jimenez is an individual currently residing in La Colonia Miguel Hidalgo, Municipio La Trinitaria, Estado de Chiapas, Mexico. During all relevant times prior to March 2007, she resided in Philadelphia, Pennsylvania. She was directly paid by RCI from approximately May 2006 until December 2006.

5.     Plaintiff Rosalba Lopez Perez is an individual currently residing in La Colonia Miguel Hidalgo, Municipio La Trinitaria, Estado de Chiapas, Mexico. During all relevant times prior to March 2007, she resided in Philadelphia, Pennsylvania. She was directly paid by RCI from approximately January 2007 until February 21, 2007.

6.      Plaintiff Gilberto Martinez Garcia is an individual currently residing in a U.S. Immigration and Customs Enforcement ("ICE") detention center in York, Pennsylvania.  During all relevant times prior to March 2007, he resided in Philadelphia, Pennsylvania.  He was directly paid by RCI from approximately February 2003 until February 21, 2007.

7.      Plaintiff Homero Martinez Garcia is an individual currently residing in a U.S. Immigration and Customs Enforcement ("ICE") detention center in York, Pennsylvania.  During all relevant times prior to March 2007, he resided in Philadelphia, Pennsylvania.  He was directly paid by RCI from approximately February 2003 until approximately September, 2006.

8.      Plaintiff Miguel Martinez Garcia is an individual currently residing in a U.S. Immigration and Customs Enforcement ("ICE") detention center in York, Pennsylvania.  From 2001 until December 27, 2006, he resided in Traverse City, Michigan.  Then, from December 27, 2006, until February 21, 2007, he resided in Philadelphia, Pennsylvania.  He was directly paid by RCI from approximately 2001 until February 22, 2006, and again from approximately January 2007 until February 21, 2007.

9.      Plaintiff Dora Martinez Lopez is an individual currently residing in a U.S. Immigration and Customs Enforcement ("ICE") detention center in York, Pennsylvania.  During all relevant times prior to March 2007, she resided in Philadelphia, Pennsylvania.  She was directly paid by RCI from approximately February, 2006, until February 21, 2007.

10.      Plaintiff Miguel Martinez Lopez is an individual currently residing in a U.S. Immigration and Customs Enforcement ("ICE") detention center in York,

Pennsylvania.  From approximately April 2005 until December 27, 2006, he resided in Traverse City, Michigan.  Then, from December 27, 2006, until February 21, 2007, he resided in Philadelphia, Pennsylvania.  He was directly paid by RCI from approximately April 2005 until approximately February 2006 and again from from approximately January 2007 until February 21, 2007.

11.     Plaintiff Omar Martinez Lopez is an individual currently residing in a U.S. Immigration and Customs Enforcement ("ICE") detention center in York, Pennsylvania. During all relevant times prior to March 2007, he resided in Philadelphia, Pennsylvania. He was directly paid by RCI from approximately January 2007 until February 21, 2007.

12.     Plaintiff Jose Martinez Velasco is an individual currently residing in La Colonia Miguel Hidalgo, Municipio La Trinitaria, Estado de Chiapas, Mexico.  From approximately 2004 until 2005, he resided in Philadelphia, Pennsylvania.  Then, from approximately 2005 until January 1, 2007, he resided in Atlantic City, New Jersey.  He was directly paid by RCI from approximately 2004 until January 1, 2007.

13.     Plaintiff Jose Morales Lopez is an individual currently residing in a U.S. Immigration and Customs Enforcement ("ICE") detention center in York, Pennsylvania. During all relevant times prior to March 2007, he resided in Pittsburgh, Pennsylvania. He was directly paid by RCI from approximately January 2001 until February 21, 2007.

14.     Plaintiff Alfonso Orozco Lopez is an individual currently residing in a U.S. Immigration and Customs Enforcement ("ICE") detention center in York, Pennsylvania.  During all relevant times prior to March 2007, he resided in Pittsburgh, Pennsylvania.  He was directly paid by RCI from approximately August 2004 until February 21, 2007.

4

15.     Plaintiff Jose Francisco Ramirez Perez is an individual currently residing in a U.S. Immigration and Customs Enforcement ("ICE") detention center in York, Pennsylvania.  During all relevant times prior to March 2007, he resided in Philadelphia, Pennsylvania.  He was directly paid by RCI from approximately June 2006 until February 21, 2007.

16.     Plaintiff Evandro Velasco Lopez is an individual currently residing in a U.S. Immigration and Customs Enforcement ("ICE") detention center in York, Pennsylvania.  During all relevant times prior to March 2007, he resided in Philadelphia, Pennsylvania.  He was directly paid by RCI from approximately March 2004 until February 21, 2007.

17.     Plaintiff Gloria Velasco Lopez is an individual currently residing in La Colonia Miguel Hidalgo, Municipio La Trinitaria, Estado de Chiapas, Mexico.  During all relevant times prior to March 2007, she resided in Philadelphia, Pennsylvania.  She was directly paid by RCI from approximately April 6, 2006, until February 21, 2007.

18.     Plaintiff Ivan Velasco Lopez is an individual currently residing in a U.S. Immigration and Customs Enforcement ("ICE") detention center in York, Pennsylvania. During all relevant times prior to March 2007, he resided in Philadelphia, Pennsylvania. He was directly paid by RCI from approximately February 2005 until February 21, 2007.

19.     The above-listed individuals are collectively referred to herein as "Plaintiffs."

20.     Defendant Rosenbaum-Cunningham, Inc. ("RCI") is a corporate entity incorporated under Nevada law, headquartered in Florida, and doing business in various states, including Pennsylvania.

5

21.     Defendant Richard S. Rosenbaum ("Rosenbaum") is an owner and operator of RCI and, upon information and belief, currently resides in Florida.  During all relevant times, Rosenbaum actively participated in RCI's business operations and exercised substantial control over the business practices challenged in this lawsuit.

22.     Defendant Edward Scott Cunningham ("Cunningham") is an owner and operator of RCI and, upon information and belief, currently resides in Florida.  During all relevant times, Cunningham actively participated in RCI's business operations and exercised substantial control over the business practices challenged in this lawsuit.

23.     Defendant Christina A. Flocken ("Flocken") is an owner and operator of RCI and, upon information and belief, currently resides in Florida.  During all relevant times, Flocken actively participated in RCI's business operations and exercised substantial control over the business practices challenged in this lawsuit.

24.     Defendants RCI, Rosenbaum, Cunningham, and Flocken are collectively referred to herein as "the RCI Defendants."

25.     The RCI Defendants regularly engage in interstate commerce and were employers within the meaning of the FLSA, 29 U.S.C. §§ 206-207.

26.     Defendant Dave & Busters, Inc. ("D&B") is a corporate entity incorporated under Missouri law, headquartered in Texas, and doing business in various states, including Pennsylvania.

27.     D&B regularly engages in interstate commerce and, acting in conjunction with the RCI Defendants, was an employer within the meaning of the FLSA, 29 U.S.C. §§ 206-207.

## COMMON FACTUAL ALLEGATIONS
## <u>CONCERNING THE RCI DEFENDANTS</u>

28.     The RCI Defendants own and operate a janitorial cleaning service that primarily caters to the theme restaurant and entertainment industry throughout the United States.

29.     RCI's workforce consists of hundreds of custodial workers, many of whom are low-wage immigrant workers hailing from Mexico, Honduras, Guatemala, and other South American countries.  These individuals are collectively referred to herein as "the Workers."

30.     RCI contracts with various companies that own and/or operate theme restaurants and other large entertainment facilities throughout the United States to provide janitorial services at the restaurants/facilities.  Through RCI, the Workers provide janitorial services at many well-known restaurants/facilities, including, *inter alia*, D&B, the Hard Rock Cafe, Planet Hollywood, and ESPN Zone.

31.     On February 15, 2007, a Grand Jury sitting in the United States District Court for the Western District of Michigan issued a criminal indictment accusing Rosenbaum, Cunningham, and Flocken of various crimes, including: (i) conspiracy to defraud the United States and to harbor illegal aliens; (ii) bringing in and harboring illegal aliens; and (iii) failure to pay taxes.

32.     RCI, pursuant to its common business practices, pays many of the Workers in cash rather than by check and fails to pay any payroll or other required taxes for the Workers.

33.     RCI, pursuant to its common business practices, pays all of the Workers a weekly pay rate that when divided equals an hourly pay rate of less than $5.15 for some of the Workers.

34.     RCI, pursuant to its common business practices, requires the Workers to work far in excess of forty hours per workweek, and, in fact, most of the Workers routinely work well over seventy hours per week.

35.     RCI, pursuant to its common business practices, fails to pay the Workers any overtime premium for hours worked over forty in a workweek.

36.     RCI, pursuant to its common business practices, fails to maintain time or payroll records reflecting the hours worked and compensation received by the Workers.

**COMMON FACTUAL
ALLEGATIONS CONCERNING D&B**

37.     D&B owns and operates approximately forty-six large venue, high-volume restaurant/entertainment complexes throughout the United States.  These complexes are referred to herein as "D&B Complexes."

38.     D&B owns and operates two D&B Complexes in Philadelphia, Pennsylvania, and one D&B complex in Pittsburgh, Pennsylvania.  These include a complex at 325 North Columbus Boulevard, Philadelphia ("the Columbus Blvd. D&B"), 1995 Franklin Mills Circle, Philadelphia ("the Franklin Mills D&B"), and 180 East Waterfront Drive, Homestead, Pennsylvania ("the Pittsburgh D&B").

39.     D&B has forged a contractual partnership with the RCI Defendants.  In particular, the RCI Defendants and D&B have entered into a contract whereby the Workers provide janitorial services to various D&B Complexes, including the Columbus Blvd. D&B, the Franklin Mills D&B, and the Pittsburgh D&B.

8

40.     Pursuant to D&B's business alliance with the RCI Defendants, the Workers are under the common control of both D&B and the RCI Defendants and perform work that simultaneously benefits both D&B and the RCI Defendants.  For example, as alleged in this complaint, D&B managers closely evaluate and direct the Workers' activities at the beginning and end of the workday.

41.     Pursuant to D&B's business alliance with the RCI Defendants, the RCI Defendants act directly or indirectly in the interest of D&B.

42.     Pursuant to D&B's business alliance with the RCI Defendants, many of the Workers are paid in cash rather than by check.

43.     Pursuant to D&B's business alliance with the RCI Defendants, the Workers are paid a weekly rate that when divided equaled an hourly pay rate of less than $5.15 for some of the Workers.

44.     Pursuant to D&B's business alliance with the RCI Defendants, many of the Workers work far in excess of forty hours per workweek, and, in fact, most of the Workers routinely work over seventy hours per workweek.

45.     Pursuant to D&B's business alliance with the RCI Defendants, the Workers do not receive any overtime premium for hours worked over forty in a workweek.

46.     Pursuant to D&B's business alliance with the RCI Defendants, no accurate time or payroll records are maintained reflecting the hours worked and compensation received.

## FACTUAL ALLEGATIONS
## CONCERNING PLAINTIFFS' EMPLOYMENT

### *Beatriz Jimenez*

47.     Beginning on or about May 2006, Beatriz Jimenez began working as a janitor for the RCI Defendants.

48.     From approximately May 2006 until approximately July 2006, she was assigned to the Franklin Mills D&B.  Then, from approximately July 2006 until approximately December 2006, she was assigned to the Columbus Blvd. D&B.

49.     While employed at the Franklin Mills D&B and subsequently the Columbus Blvd. D&B, working with a crew of approximately 3 to 5 other workers, routinely worked from 12:00 a.m. until 11:00 a.m., almost never had a day off, and routinely worked over seventy hours per workweek.

50.     At the commencement of her workshift, Beatriz Jimenez would be greeted by a D&B manager, who would provide her and the rest of the work crew with access to the facility.  After giving the crew various instructions for the night, the D&B manager would lock down the facility, leaving Beatriz Jimenez and her crew with no access to the outside world, except through a door only for emergency exit that would trigger an alarm if opened.

51.     Beatriz Jimenez and her crew would work continuously for approximately 9 hours.  Then, at approximately 9:00 a.m., a D&B manager would unlock the facility doors and inspect the facility.  Frequently, the D&B manager would require Beatriz Jimenez and her crew to perform additional work after the inspection, usually until 11:00 a.m., but sometimes until 1:00 p.m. or 2:00 p.m.

52.     Throughout her employment, Beatriz Jimenez regularly was paid in cash rather than by check.

53.     Throughout her employment, Beatriz Jimenez regularly received a weekly pay rate that when divided equaled an hourly pay rate of less than $5.15.

54.     Throughout her employment, Beatriz Jimenez regularly worked over 77 hours per workweek.

55.     Throughout her employment, Beatriz Jimenez routinely received no overtime premium for hours worked over forty in a workweek.

56.     Throughout her employment, no accurate time or payroll records were maintained reflecting Beatriz Jimenez's hours worked or compensation received.

### *Rosalba Lopez Perez*

57.     Beginning on or about January 3, 2007, Rosalba Lopez Perez began working as a janitor for the RCI Defendants.

58.     From approximately January 3, 2007 until approximately February 21, 2007, she was assigned to the Bugaboo Creek Steakhouse at 601 Franklin Mills Cir., Philadelphia, Pennsylvania 19154.

59.     While employed at the Bugabook Creek Steakhouse, working with a crew of approximately 3 other workers, routinely worked from 12:00 a.m. until 4:00 a.m. and she almost never had a day off.

60.     At the commencement of her workshift, Rosalba Lopez Perez would be greeted by a Bugaboo Creek Steakhouse manager, who would provide her and the rest of the work crew with access to the facility.  Rosalba Lopez Perez and her crew would work continuously for approximately 4 hours.

61.     Throughout her employment, Rosalba Lopez Perez regularly was paid in cash rather than by check.

62.     At the termination of her employment, Rosalba Lopez Perez received no pay whatsoever for the last five days of her employment.  She also received no pay for the first week of her employment.  This first week's pay was held by RCI as a deposit.

63.     Throughout her employment, no accurate time or payroll records were maintained reflecting Rosalba Lopez Perez's hours worked or compensation received

### *Gilberto Martinez Garcia*

64.     Beginning on or about January 2004, Gilberto Martinez Garcia began working as a janitor for the RCI Defendants.

65.     From approximately January 2004 until approximately July 2006, he was assigned to the Columbus Blvd. D&B.  Then, from approximately July 2006 until approximately February 21, 2007, he was assigned to the Franklin Mills D&B.

66.     While employed at the Columbus Blvd. D&B and subsequently the Franklin Mills D&B, Gilberto Martinez Garcia working with a crew of approximately 3 to 5 other workers, routinely worked from 12:00 a.m. until 11:00 a.m.  He almost never had a day off, and he routinely worked over 77 hours per workweek.

67.     At the commencement of his workshift, Gilberto Martinez Garcia would be greeted by a D&B manager, who would provide him and the rest of the work crew with access to the facility.  After giving the crew various instructions for the night, the D&B manager would lock down the facility, leaving Gilberto Martinez Garcia and his crew with no access to the outside world, except through a door only for emergency exit that would trigger an alarm if opened.

68.     Gilberto Martinez Garcia and his crew would work continuously for approximately 9 hours.  Then, at approximately 9:00 a.m., a D&B Manager would unlock the facility doors and inspect the facility.  Frequently, the D&B Manager would require Gilberto Martinez Garcia and his crew to perform additional work after the inspection, usually until 11:00 a.m., but sometimes until 12:00 a.m.

69.     Throughout his employment, Gilberto Martinez Garcia regularly was paid in cash rather than by check.

70.     From approximately January 2004 until approximately December 2005, Gilberto Martinez Garcia regularly received an hourly pay rate of less than $5.15.

71.     Throughout his employment, Gilberto Martinez Garcia regularly worked over 77 hours per workweek.

72.     Throughout his employment, Gilberto Martinez Garcia routinely received no overtime premium for hours worked over forty in a workweek.

73.     At the termination of his employment, Gilberto Martinez Garcia received no pay whatsoever for the last five days of his employment.  He also received no pay for the first week of his employment.  This first week's pay was held by RCI as a deposit.

74.     Throughout his employment, no accurate time or payroll records were maintained reflecting his hours worked or compensation received.

### *Homero Martinez Garcia*

75.     Beginning on or about August 2003, Homero Martinez Garcia began working as a janitor for the RCI Defendants.

76.     From approximately August 2003 until approximately January 2004, he was assigned to the Grand Traverse Resort and Spa, 100 Grand Traverse Village Blvd.,

Acme, Michigan 49610.  Then, from approximately January 2004 until approximately August 2005, he was assigned to the Columbus Blvd. D&B.  Then, from approximately August 2005 until approximately January 2006, he was assigned to the Franklin Mills D&B.  Then, from approximately January 2006 until approximately July 2006, he was assigned to the House of Blues at Showboat Atlantic City, Showboat Casino, 801 Boardwalk, Atlantic City, NJ 08401.  Finally, from approximately July 2006 until approximately September 2006, he was assigned to the Franklin Mills D&B.

77.     While employed at the Grand Traverse Resort and Spa, Homero Martinez Garcia lived and worked at the Spa on an around the clock 24 shift.  He was given only brief breaks of approximately 4 hours once a night to rest.  Day and night, he performed housekeeping duties including cleaning public areas of the Resort and Spa.  Miguel Martinez Garcia worked 7 days a week, almost never had a day off, and routinely worked over 110 hours per workweek.

78.     At the Grand Traverse Resort and Spa, Homero Martinez Garcia was supervised directly by the Resort staff and managers.

79.     While employed at the Columbus Blvd. D&B and the Franklin Mills D&B, Homero Martinez Garcia working with a crew of approximately 3 to 5 other workers, routinely worked from 12:00 a.m. until 11:00 a.m.  He almost never had a day off, and he routinely worked over 77 hours per workweek.

80.     At the commencement of his workshift, Homero Martinez Garcia would be greeted by a D&B manager, who would provide him and the rest of the work crew with access to the facility.  After giving the crew various instructions for the night, the D&B manager would lock down the facility, leaving Homero Martinez Garcia and his

crew with no access to the outside world, except through a door only for emergency exit that would trigger an alarm if opened.

81.     Homero Martinez Garcia and his crew would work continuously for approximately 9 hours.  Then, at approximately 9:00 a.m., a D&B Manager would unlock the facility doors and inspect the facility.  Frequently, the D&B Manager would require Homero Martinez Garcia and his crew to perform additional work after the inspection, usually until 11:00 a.m., but sometimes until 12:00 a.m.

82.     While employed at the House of Blues at Showboat, Homero Martinez Garcia was supervised by restaurant managers and chefs.  He worked a night shift from approximately 12:00 a.m. until approximately 11:00 a.m.  The chefs and managers reviewed his work in the morning at approximately 9:00 a.m. and would require Homero Martinez Garcia to perform additional work after the inspection, usually until 11:00 a.m.

83.     Throughout his employment, Homero Martinez Garcia regularly was paid in cash rather than by check.

84.     Throughout his employment, Homero Martinez Garcia regularly worked over 77 hours per workweek.

85.     Throughout his employment, Homero Martinez Garcia routinely received no overtime premium for hours worked over forty in a workweek.

86.     Throughout his employment, no accurate time or payroll records were maintained reflecting his hours worked or compensation received.

### *Miguel Martinez Garcia*

87.     Beginning on or about 2001, Miguel Martinez Garcia began working as a janitor for the RCI Defendants.

88.      From approximately 2001 until approximately February 22, 2006, he was assigned to the Grand Traverse Resort and Spa, 100 Grand Traverse Village Blvd., Acme, Michigan 49610.  Then, from approximately January 3, 2007 until approximately February 21, 2007, he was assigned to the Bugaboo Creek Steakhouse at 601 Franklin Mills Cir., Philadelphia, Pennsylvania 19154.

89.      While employed at the Grand Traverse Resort and Spa, Miguel Martinez Garcia lived and worked at the Spa on an around the clock 24 shift.  He was given only brief breaks of approximately 4 hours once a night to rest.  Day and night, he performed housekeeping duties including cleaning public areas of the Resort and Spa.  Miguel Martinez Garcia worked 7 days a week, almost never had a day off, and routinely worked over 110 hours per workweek.

90.      At the Grand Traverse Resort and Spa, Miguel Martinez Garcia was supervised directly by the Resort staff and managers.

91.      While employed at the Bugabook Creek Steakhouse, working with a crew of approximately 3 other workers, Miguel Martinez Garcia routinely worked from 12:00 a.m. until 4:00 a.m. and he almost never had a day off.

92.      At the commencement of his workshift, Miguel Martinez Garcia would be greeted by a Bugaboo Creek Steakhouse manager, who would provide him and the rest of the work crew with access to the facility.

93.      Miguel Martinez Garcia and his crew would work continuously for approximately 4 hours.

94.      Throughout his employment, Miguel Martinez Garcia regularly was paid in cash rather than by check.

95.     From approximately 2004 until approximately February 22, 2006, Miguel Martinez Garcia regularly received an hourly pay rate of less than $5.15.

96.     Throughout his employment, Miguel Martinez Garcia routinely received no overtime premium for hours worked over forty in a workweek.

97.     At the termination of his employment, Miguel Martinez Garcia received no pay whatsoever for the last five days of his employment.  He also received no pay for the first week of his employment.  This first week's pay was held by RCI as a deposit.

98.     Throughout his employment, no accurate time or payroll records were maintained reflecting his hours worked or compensation received.

### *Dora Martinez Lopez*

99.     Beginning on or about February 2006, Dora Martinez Lopez began working as a janitor for the RCI Defendants.

100.    From approximately February 2006 until approximately July 2006, she was assigned to the Franklin Mills D&B.  Then, from approximately July 2006 until approximately February 21, 2007, she was assigned to the Columbus Blvd. D&B.

101.    While employed at the Franklin Mills D&B and subsequently the Columbus Blvd. D&B, Dora Martinez Lopez working with a crew of approximately 3 to 5 other workers, routinely worked from 12:00 a.m. until 11:00 a.m.  She almost never had a day off, and she routinely worked over 77 hours per workweek.

102.    At the commencement of her workshift, Dora Martinez Lopez would be greeted by a D&B manager, who would provide her and the rest of the work crew with access to the facility.  After giving the crew various instructions for the night, the D&B manager would lock down the facility, leaving Dora Martinez Lopez and her crew with

no access to the outside world, except through a door only for emergency exit that would trigger an alarm if opened.

103.    Dora Martinez Lopez and her crew would work continuously for approximately 9 hours.  Then, at approximately 9:00 a.m., a D&B Manager would unlock the facility doors and inspect the facility.  Frequently, the D&B Manager would require Dora Martinez Lopez and her crew to perform additional work after the inspection, usually until 11:00 a.m., but sometimes until 12:00 a.m.

104.    Throughout her employment, Dora Martinez Lopez regularly was paid in cash rather than by check.

105.    Throughout her employment, Dora Martinez Lopez regularly received an hourly pay rate of less than $5.15.

106.    Throughout her employment, Dora Martinez Lopez regularly worked over 77 hours per workweek.

107.    Throughout her employment, Dora Martinez Lopez routinely received no overtime premium for hours worked over forty in a workweek.

108.    At the termination of her employment, Dora Martinez Lopez received no pay whatsoever for the last five days of her employment.  She also received no pay for the first week of her employment.  This first week's pay was held by RCI as a deposit.

109.    Throughout her employment, no accurate time or payroll records were maintained eflecting her hours worked or compensation received.

### *Miguel Martinez Lopez*

110.    Beginning on or about April 2005, Miguel Martinez Lopez began working as a janitor for the RCI Defendants.

111.    From approximately April 2005 until approximately February 2006, he was assigned to the Grand Traverse Resort and Spa, 100 Grand Traverse Village Blvd., Acme, Michigan 49610.  Then, from approximately January 3, 2007 until approximately February 21, 2007, he was assigned to the Columbus Blvd. D&B.

112.    While employed at the Grand Traverse Resort and Spa, Miguel Martinez Lopez lived and worked at the Resort and Spa.  He worked the daytime shift, from 8:30 a.m. until approximately 7 p.m., 7 days per workweek and a night shift, from 10:00 p.m. until approximately 6 a.m., 2 or 3 times per a workweek.  Day and night, he performed housekeeping duties including cleaning guest rooms and public areas of the Resort and Spa.  Miguel Martinez Lopez worked 7 days a week, almost never had a day off, and routinely worked over 80 hours per workweek.

113.    At the Grand Traverse Resort and Spa, Miguel Martinez Lopez was supervised directly by the Resort staff and managers.

114.    While employed at the Columbus Blvd. D&B, Miguel Martinez Lopez working with a crew of approximately 3 to 5 other workers, routinely worked from 12:00 a.m. until 11:00 a.m.  He almost never had a day off, and he routinely worked over 77 hours per workweek.

115.    At the commencement of his workshift, Miguel Martinez Lopez would be greeted by a D&B manager, who would provide him and the rest of the work crew with access to the facility.  After giving the crew various instructions for the night, the D&B manager would lock down the facility, leaving Miguel Martinez Lopez and his crew with no access to the outside world, except through a door only for emergency exit that would trigger an alarm if opened.

116.    Miguel Martinez Lopez and his crew would work continuously for approximately 9 hours.  Then, at approximately 9:00 a.m., a D&B Manager would unlock the facility doors and inspect the facility.  Frequently, the D&B Manager would require Miguel Martinez Lopez and his crew to perform additional work after the inspection, usually until 11:00 a.m., but sometimes until 1:00 p.m. or 2:00 p.m.

117.    Throughout his employment, Miguel Martinez Lopez regularly was paid in cash rather than by check.

118.    Throughout his employment, Miguel Martinez Lopez regularly worked over 77 hours per workweek.

119.    Throughout his employment, Miguel Martinez Lopez routinely received no overtime premium for hours worked over forty in a workweek.

120.    At the termination of his employment, Miguel Martinez Lopez received no pay whatsoever for the last five days of his employment.  He also received no pay for the first week of his employment.  This first week's pay was held by RCI as a deposit.

121.    Throughout his employment, no accurate time or payroll records were maintained reflecting his hours worked or compensation received.

### *Omar Martinez Lopez*

122.    Beginning on or about late January 2007, Omar Martinez Lopez began working as a janitor for the RCI Defendants.

123.    From approximately late January 2007 until approximately February 21, 2007, he was assigned to the Columbus Blvd. D&B.

124.    While employed at the Columbus Blvd. D&B, Omar Martinez Lopez working with a crew of approximately 3 to 5 other workers, routinely worked from 12:00

a.m. until 11:00 a.m.  He almost never had a day off, and he routinely worked over 77 hours per workweek.

125.    At the commencement of his workshift, Omar Martinez Lopez would be greeted by a D&B manager, who would provide him and the rest of the work crew with access to the facility.  After giving the crew various instructions for the night, the D&B manager would lock down the facility, leaving Omar Martinez Lopez and his crew with no access to the outside world, except through a door only for emergency exit that would trigger an alarm if opened.

126.    Omar Martinez Lopez and his crew would work continuously for approximately 9 hours.  Then, at approximately 9:00 a.m., a D&B Manager would unlock the facility doors and inspect the facility.  Frequently, the D&B Manager would require Omar Martinez Lopez and his crew to perform additional work after the inspection, usually until 11:00 a.m., but sometimes until 1:00 p.m. or 2:00 p.m.

127.    Throughout his employment, Omar Martinez Lopez regularly was paid in cash rather than by check.

128.    Throughout his employment, Omar Martinez Lopez regularly worked over 77 hours per workweek.

129.    Throughout his employment, Omar Martinez Lopez routinely received no overtime premium for hours worked over forty in a workweek.

130.    At the termination of his employment, Omar Martinez Lopez received no pay whatsoever for the last five days of his employment.  He also received no pay for the first week of his employment.  This first week's pay was held by RCI as a deposit.

131.    Throughout his employment, no accurate time or payroll records were maintained reflecting his hours worked or compensation received.

### *Jose Martinez Velasco*

132.    Beginning on or about 2004, Jose Martinez Velasco began working as a janitor for the RCI Defendants.

133.    From approximately 2004 until approximately 2005, for a period of approximately 1 year, he was assigned to the Columbus Blvd. D&B.  Then, during 2005 for a period of approximately 6 months, he was assigned to the House of Blues at Showboat Atlantic City, Showboat Casino, 801 Boardwalk, Atlantic City, NJ 08401. Then, from approximately January 2006, until approximately January 1, 2007, for a period of approximately 1 year, he alternated between working at the Continental Restaurant, The Pier at Caesars, One Atlantic Ocean, Atlantic City, NJ 08401, and the Buddakan Restaurant, The Pier at Caesars, One Atlantic Ocean, Atlantic City, NJ 08401.

134.    While employed at the Columbus Blvd. D&B, Jose Martinez Velasco working with a crew of approximately 3 to 5 other workers, routinely worked from 12:00 a.m. until 11:00 a.m.  He almost never had a day off, and he routinely worked over 77 hours per workweek.

135.    At the commencement of his workshift, Jose Martinez Velasco would be greeted by a D&B manager, who would provide him and the rest of the work crew with access to the facility.  After giving the crew various instructions for the night, the D&B manager would lock down the facility, leaving Jose Martinez Velasco and his crew with no access to the outside world, except through a door only for emergency exit that would trigger an alarm.

136.    Jose Martinez Velasco and his crew would work continuously for approximately 9 hours.  Then, at approximately 9:00 a.m., a D&B Manager would unlock the facility doors and inspect the facility.  Frequently, the D&B Manager would require Jose Martinez Velasco and his crew to perform additional work after the inspection, usually until 11:00 a.m., but sometimes until 12:00 a.m.

137.    In all three restaurants in Atlantic City, the House of Blues, Continental, and Buddakan, Jose Martinez Velasco was supervised by restaurant managers and chefs.  He worked a night shift from approximately 12:00 a.m. until approximately 11:00 a.m.  He was assigned to clean the equipment and area within the kitchen as well as the dining area.  The chefs and managers reviewed his work in the morning at approximately 9:00 a.m. and would require Jose Martinez Velasco to perform additional work after the inspection, usually until 11:00 a.m.

138.    Throughout his employment, Jose Martinez Velasco regularly was paid in cash rather than by check.

139.    While working at the Columbus Blvd. D&B for 6 months from 2004 to 2005, Jose Martinez Velasco regularly received an hourly pay rate of less than $5.15.

140.    Throughout his employment at all RCI worksites, Jose Martinez Velasco regularly worked over 77 hours per workweek.

141.    Throughout his employment, Jose Martinez Velasco routinely received no overtime premium for hours worked over forty in a workweek.

142.    Throughout his employment, no accurate time or payroll records were maintained reflecting his hours worked or compensation received.

*Jose Morales Lopez*

143.    Beginning on or about January 2001, Jose Morales Lopez began working as a janitor for the RCI Defendants.

144.    From approximately January 2001 until approximately February 21, 2007, he was assigned to the Pittsburgh D&B.

145.    While employed at the Pittsburgh D&B, Jose Morales Lopez working with a crew of approximately 3 to 5 other workers, routinely worked from 12:00 a.m. until 11:00 a.m.  He almost never had a day off, and he routinely worked over 77 hours per workweek.

146.    At the commencement of his workshift, Jose Morales Lopez would be greeted by a D&B manager, who would provide him and the rest of the work crew with access to the facility.  The D&B manager would greet the crew and give them various instructions for the night.

147.    Jose Morales Lopez and his crew would work continuously for approximately 9 hours.  Then, at approximately 9:00 a.m., a D&B Manager would inspect the facility.  Frequently, the D&B Manager would require Jose Morales Lopez and his crew to perform additional work after the inspection, usually until 11:00 a.m., but sometimes until 12:00 a.m.

148.    Throughout his employment, Jose Morales Lopez regularly was paid in cash rather than by check.

149.    Throughout his employment at all RCI worksites, Jose Morales Lopez regularly worked over 77 hours per workweek.

150.    Throughout his employment, Jose Morales Lopez routinely received no overtime premium for hours worked over forty in a workweek.

151.    At the termination of his employment, Jose Morales Lopez received no pay whatsoever for the last five days of his employment.  He also received no pay for the first week of his employment.  This first week's pay was held by RCI as a deposit.

152.    Throughout his employment, no accurate time or payroll records were maintained reflecting his hours worked or compensation received.

### Alfonso Orozco Lopez

153.    Beginning on or about August 2004, Alfonso Orozco Lopez began working as a janitor for the RCI Defendants.

154.    From approximately August 2004 until approximately February 21, 2007, he was assigned to the Pittsburgh D&B.

155.    While employed at the Pittsburgh D&B, Alfonso Orozco Lopez working with a crew of approximately 3 to 5 other workers, routinely worked from 12:00 a.m. until 11:00 a.m.  He almost never had a day off, and he routinely worked over 77 hours per workweek.

156.    At the commencement of his workshift, Alfonso Orozco Lopez would be greeted by a D&B manager, who would provide him and the rest of the work crew with access to the facility.  The D&B manager would greet the crew and give them various instructions for the night.

157.    Alfonso Orozco Lopez and his crew would work continuously for approximately 9 hours.  Then, at approximately 9:00 a.m., a D&B Manager would inspect the facility.  Frequently, the D&B Manager would require Alfonso Orozco Lopez

and his crew to perform additional work after the inspection, usually until 11:00 a.m., but sometimes until 12:00 a.m.

158.    Throughout his employment, Alfonso Orozco Lopez regularly was paid in cash rather than by check.

159.    Throughout his employment, Alfonso Orozco Lopez regularly received an hourly pay rate of less than $5.15.

160.    Throughout his employment at all RCI worksites, Alfonso Orozco Lopez regularly worked over 77 hours per workweek.

161.    Throughout his employment, Alfonso Orozco Lopez routinely received no overtime premium for hours worked over forty in a workweek.

162.    At the termination of his employment, Alfonso Orozco Lopez received no pay whatsoever for the last five days of his employment.  He also received no pay for the first week of his employment.  This first week's pay was held by RCI as a deposit.

163.    Throughout his employment, no accurate time or payroll records were maintained reflecting his hours worked or compensation received.

### *Jose Francisco Ramirez Perez*

164.    Beginning on or about June 2006, Jose Francisco Ramirez Perez began working as a janitor for the RCI Defendants.

165.    From approximately June 2006 until approximately February 21, 2007, he was assigned to the Columbus Blvd. D&B.

166.    While employed at the Columbus Blvd. D&B, Jose Francisco Ramirez Perez working with a crew of approximately 3 to 5 other workers, routinely worked from

12:00 a.m. until 11:00 a.m.  He almost never had a day off, and he routinely worked over 77 hours per workweek.

167.    At the commencement of his workshift, Jose Francisco Ramirez Perez would be greeted by a D&B manager, who would provide him and the rest of the work crew with access to the facility.  After giving the crew various instructions for the night, the D&B manager would lock down the facility, leaving Jose Francisco Ramirez Perez and his crew with no access to the outside world, except through a door only for emergency exit that would trigger an alarm if opened.

168.    Jose Francisco Ramirez Perez and his crew would work continuously for approximately 9 hours.  Then, at approximately 9:00 a.m., a D&B Manager would unlock the facility doors and inspect the facility.  Frequently, the D&B Manager would require Jose Francisco Ramirez Perez and his crew to perform additional work after the inspection, usually until 11:00 a.m., but sometimes until 12:00 a.m.

169.    Throughout his employment, Jose Francisco Ramirez Perez regularly was paid in cash rather than by check.

170.    Throughout his employment, Jose Francisco Ramirez Perez regularly worked over 77 hours per workweek.

171.    Throughout his employment, Jose Francisco Ramirez Perez routinely received no overtime premium for hours worked over forty in a workweek.

172.    At the termination of his employment, Jose Francisco Ramirez Perez received no pay whatsoever for the last five days of his employment.  He also received no pay for the first week of his employment.  This first week's pay was held by RCI as a deposit.

173.   Throughout his employment, no accurate time or payroll records were maintained reflecting his hours worked or compensation received.

### *Evandro Velasco Lopez*

174.   Beginning on or about March 2004, Evandro Velasco Lopez began working as a janitor for the RCI Defendants.

175.   From approximately March 2004 until approximately March 2005, for a period of approximately 1 year, he was assigned to the Columbus Blvd. D&B.  Then, from approximately March 2005 until approximately February 21, 2007, he was assigned to the Franklin Mills D&B.

176.   Throughout his employment, Evandro Velasco Lopez working with a crew of approximately 3 to 5 other workers, routinely worked from 12:00 a.m. until 11:00 a.m. He almost never had a day off, and he routinely worked over 77 hours per workweek.

177.   At the commencement of his workshift, Evandro Velasco Lopez would be greeted by a D&B manager, who would provide him and the rest of the work crew with access to the facility.  After giving the crew various instructions for the night, the D&B manager would lock down the facility, leaving Evandro Velasco Lopez and his crew with no access to the outside world, except through a door only for emergency exit that would trigger an alarm if opened.

178.   Evandro Velasco Lopez and his crew would work continuously for approximately 9 hours.  Then, at approximately 9:00 a.m., a D&B Manager would unlock the facility doors and inspect the facility.  Frequently, the D&B Manager would require Evandro Velasco Lopez and his crew to perform additional work after the inspection, usually until 11:00 a.m., but sometimes until 12:00 a.m.

179.     Throughout his employment, Evandro Velasco Lopez regularly was paid in cash rather than by check.

180.     From approximately March 2004 until approximately March 2005, Evandro Velasco Lopez regularly received an hourly pay rate of less than $5.15.

181.     Throughout his employment, Evandro Velasco Lopez regularly worked over 77 hours per workweek.

182.     Throughout his employment, Evandro Velasco Lopez routinely received no overtime premium for hours worked over forty in a workweek.

183.     At the termination of his employment, Evandro Velasco Lopez received no pay whatsoever for the last five days of his employment.  He also received no pay for the first week of his employment.  This first week's pay was held by RCI as a deposit.

184.     Throughout his employment, no accurate time or payroll records were maintained reflecting his hours worked or compensation received.

### *Gloria Velasco Lopez*

185.     Beginning on or about April 6, 2006, Gloria Velasco Lopez began working as a janitor for the RCI Defendants.

186.     From approximately April 6, 2006 until approximately October 2006, she was assigned to the Columbus Blvd. D&B.  Then, from approximately October 2006 until approximately February 21, 2007, she was assigned to the Franklin Mills Blvd. D&B.

187.     While employed at the Columbus Blvd. D&B and subsequently the Franklin Mills D&B, Gloria Velasco Lopez working with a crew of approximately 3 to 5

other workers, routinely worked from 12:00 a.m. until 11:00 a.m.  She almost never had a day off, and she routinely worked over 77 hours per workweek.

188.    At the commencement of her workshift, Gloria Velasco Lopez would be greeted by a D&B manager, who would provide her and the rest of the work crew with access to the facility.  After giving the crew various instructions for the night, the D&B manager would lock down the facility, leaving Gloria Velasco Lopez and her crew with no access to the outside world, except through a door only for emergency exit that would trigger an alarm if opened.

189.    Gloria Velasco Lopez and her crew would work continuously for approximately 9 hours.  Then, at approximately 9:00 a.m., a D&B Manager would unlock the facility doors and inspect the facility.  Frequently, the D&B Manager would require Gloria Velasco Lopez and her crew to perform additional work after the inspection, usually until 11:00 a.m., but sometimes until 12:00 a.m.

190.    Throughout her employment, Gloria Velasco Lopez regularly was paid in cash rather than by check.

191.    From approximately April 6, 2006 until approximately February 1, 2007, Gloria Velasco Lopez regularly received an hourly pay rate of less than $5.15.

192.    Throughout her employment, Gloria Velasco Lopez regularly worked over 77 hours per workweek.

193.    Throughout her employment, Gloria Velasco Lopez routinely received no overtime premium for hours worked over forty in a workweek.

194.    At the termination of her employment, Gloria Velasco Lopez received no pay whatsoever for the last five days of her employment.  She also received no pay for the first week of her employment.  This first week's pay was held by RCI as a deposit.

195.    Throughout her employment, no accurate time or payroll records were maintained reflecting her hours worked or compensation received.

### Ivan Velasco Lopez

196.    Beginning on or about February 2005, Ivan Velasco Lopez began working as a janitor for the RCI Defendants.

197.    From approximately February 2005 until approximately February 21, 2007, he was assigned to the Columbus Blvd. D&B.

198.    Throughout his employment, Ivan Velasco Lopez working with a crew of approximately 3 to 5 other workers, routinely worked from 12:00 a.m. until 11:00 a.m. He almost never had a day off, and he routinely worked over 77 hours per workweek.

199.    At the commencement of his workshift, Ivan Velasco Lopez would be greeted by a D&B manager, who would provide him and the rest of the work crew with access to the facility.  After giving the crew various instructions for the night, the D&B manager would lock down the facility, leaving Ivan Velasco Lopez and his crew with no access to the outside world, except through a door only for emergency exit that would trigger an alarm if opened.

200.    Ivan Velasco Lopez and his crew would work continuously for approximately 9 hours.  Then, at approximately 9:00 a.m., a D&B Manager would unlock the facility doors and inspect the facility.  Frequently, the D&B Manager would require

Ivan Velasco Lopez and his crew to perform additional work after the inspection, usually until 11:00 a.m., but sometimes until 12:00 a.m.

201.    Throughout his employment, Ivan Velasco Lopez regularly was paid in cash rather than by check.

202.    From approximately February 2005 until approximately July 2006, Ivan Velasco Lopez regularly received an hourly pay rate of less than $5.15.

203.    Throughout his employment, Ivan Velasco Lopez regularly worked over 77 hours per workweek.

204.    Throughout his employment, Ivan Velasco Lopez routinely received no overtime premium for hours worked over forty in a workweek.

205.    At the termination of his employment, Ivan Velasco Lopez received no pay whatsoever for the last five days of his employment.  He also received no pay for the first week of his employment.  This first week's pay was held by RCI as a deposit.

206.    Throughout his employment, no accurate time or payroll records were maintained reflecting his hours worked or compensation received.

### COLLECTIVE ACTION ALLEGATIONS

207.    Plaintiffs bring this action, pursuant to 29 U.S.C. § 216(b), against the RCI Defendants as a collective action on behalf of all individuals who performed cleaning, janitorial, or custodial work on behalf of the RCI Defendants or any of its corporate parents, subsidiaries, or affiliates during any time period since March 18, 2004.  These individuals are referred to herein as "the RCI Class."

208.    In addition, Plaintiffs bring this action, pursuant to 29 U.S.C. § 216(b), against the D&B as a collective action on behalf of all individuals who, during any time

period since March 18, 2004, performed cleaning, janitorial, or custodial work at any D&B Complex pursuant to any contract or other business relationship between the RCI Defendants, D&B, or any of their corporate parents, subsidiaries, or affiliates. These individuals are referred to herein as the "D&B Subclass."

209.    Plaintiffs and the above class members are "similarly situated," as that term is defined in 29 U.S.C. § 216(b), because, *inter alia*, all class members worked pursuant to Defendants' common business practices and, as a result of such practices, were not compensated for all work performed during the workday and, where such work hours exceeded forty hours in a workweek, were not paid the legally mandated overtime premium.

## COUNT I

**(Asserted by Plaintiffs, on Behalf of Themselves and the
RCI Class, Against the RCI Defendants for Violations of the FLSA)**

210.    Plaintiffs incorporate by reference all previous paragraphs as though fully set forth herein.

211.    The FLSA requires that covered employees be compensated for every hour worked in a workweek and that they receive a minimum wage of not less than $5.15 per hour.  *See* 29 U.S.C. § 206(b).

212.    The FLSA requires that covered employees receive overtime compensation "not less than one and one-half times" the employee's regular rate of pay for all hours worked over 40 in a workweek.  *See* 29 U.S.C. § 207(a)(1).

213.    The FLSA requires employers to maintain detailed payroll data concerning all covered employees.  *See* 29 U.S.C. § 211(c); 29 C.F.R. § 516.2.

33

214.     Plaintiffs and the proposed RCI Class are covered employees entitled to the FLSA's protections.

215.     The RCI Defendants are covered employers required to comply with the FLSA's mandates.

216.     The RCI Defendants have violated the FLSA with respect to Plaintiffs and the RCI Class by, *inter alia*, failing to compensate Plaintiffs and the RCI Class for all hours worked, failing to compensate Plaintiffs and the RCI Class at the minimum wage of $5.15 per hour, failing to pay Plaintiffs and the RCI Class the legally mandated overtime premium, and failing to maintain payroll records in compliance with federal law.

217.     In violating the FLSA, the RCI Defendants acted willfully and with reckless disregard of clearly applicable FLSA provisions.

## COUNT II

**(Asserted by Plaintiffs, on Behalf of Themselves and the
D&B Subclass, Against D&B for Violations of the FLSA)**

218.     Plaintiffs incorporate by reference all previous paragraphs as though fully set forth herein.

219.     The FLSA requires that covered employees be compensated for every hour worked in a workweek and that they receive a minimum wage of not less than $5.15 per hour.  *See* 29 U.S.C. § 206(b).

220.     The FLSA requires that covered employees receive overtime compensation "not less than one and one-half times" the employee's regular rate of pay for all hours worked over 40 in a workweek.  *See* 29 U.S.C. § 207(a)(1).

221.    The FLSA requires employers to maintain detailed payroll data concerning all covered employees.  *See* 29 U.S.C. § 211(c); 29 C.F.R. § 516.2.

222.    Plaintiffs and the proposed D&B Subclass are covered employees entitled to the FLSA's protections.

223.    D&B is an employer required to comply with the FLSA's mandates.

224.    D&B has violated the FLSA with respect to Plaintiffs and the D&B Subclass by, *inter alia*, failing to compensate Plaintiffs and the D&B Subclass for all hours worked, failing to compensate Plaintiffs and the D&B Subclass at the minimum wage of $5.15 per hour, failing to pay Plaintiffs and the D&B Subclass the legally mandated overtime premium, and failing to maintain payroll records in compliance with federal law.

225.    In violating the FLSA, D&B acted willfully and with reckless disregard of clearly applicable FLSA provisions.

## COUNT III

### (Asserted by All Plaintiffs Individually Against the RCI Defendants and D&B for Violations of the PMWA)

226.    Plaintiffs incorporate by reference all previous paragraphs as though fully set forth herein.

227.    The PMWA requires that covered employees be compensated for every hour worked in a workweek and that they receive a minimum wage of not less than $6.25 per hour workweek.  *See* 43 P.S. § 333.104(a).

228.    The PMWA requires that employees receive overtime compensation "not less than one and one-half times" the employee's regular rate of pay for all hours worked over 40 in a workweek.  *See* 43 P.S. § 333.104(c).

229. The PMWA requires employers to maintain detailed payroll data concerning all covered employees. *See* 43 P.S. § 333.108; 34 Pa. Code § 231.31.

230. Plaintiffs are covered employees entitled to the PMWA's protections.

231. The RCI Defendants and D&B are covered employers required to comply with the PMWA's mandates.

232. The RCI Defendants and D&B have violated the PMWA with respect to Plaintiffs by, *inter alia*, failing to compensate Plaintiffs for all hours worked, failing to compensate Plaintiffs at the minimum wage of $6.25 per hour, failing to pay Plaintiffs the legally mandated overtime premium, and failing to maintain payroll records in compliance with state law.

233. In violating the PMWA, the RCI Defendants and D&B acted willfully and with reckless disregard of clearly applicable PMWA provisions.

## COUNT IV

### (Asserted by All Plaintiffs Individually Against the RCI Defendants and D&B for Violations of the PWPCL)

234. Plaintiffs incorporate by reference all previous paragraphs as though fully set forth herein.

235. The PWPCL requires that covered employees be compensated for every hour worked in a workweek. *See* 43 P.S. § 260.3.

236. Plaintiffs are covered employees entitled to the PWPCL's protections.

237. The RCI Defendants and D&B are covered employers required to comply with the PWPCL's mandates.

238. The RCI Defendants and D&B have violated the PWPCL by failing to compensate Plaintiffs for all hours worked.

239.    In violating the PWPCL, the RCI Defendants and D&B acted willfully and with reckless disregard of clearly applicable PWPCL provisions.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following relief on behalf of themselves and all others similarly situated:

A.    An order permitting this litigation to proceed as a collective action pursuant to 29 U.S.C. § 216(b);

B.    Prompt notice, pursuant to 29 U.S.C. § 216(b), of this litigation to all potential members of the RCI Class and the D&B Subclass;

C.    An injunction prohibiting Defendants from engaging in future violations of the FLSA, PMWA, or PWPCL;

D.    Compensatory and back pay damages to the fullest extent permitted under federal and state law;

E.    Liquidated damages to the fullest extent permitted under federal and state law;

F.    Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under federal and state law; and

G.    Such other relief as this Court deems just and proper.

Date:  March 18, 2007                          Respectfully submitted,


_____          _____
Justin Mixon                                   Peter Winebrake
Attorney at Law                                THE WINEBRAKE LAW FIRM, LLC
317 Hillside Avenue                            Twining Office Center, Suite 114
Jenkintown, PA  19046                          715 Twining Road
Ph:  (215) 886-3873                            Dresher, PA 19025
                                               Ph:  (215) 884-2491